IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 19, 2011

## TIMMIE DARRELL BOSTON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-D-2391    J. Randall Wyatt, Jr., Judge**

_____

**No. M2010-01043-CCA-R3-PC - Filed November 16, 2011**

_____

The petitioner, Timmie Darrell Boston, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief. After trial, a jury convicted him of rape of a child, a Class A felony, and assault by offensive or provocative contact, a Class B misdemeanor. He was sentenced as a Range I, standard offender and received an effective twenty-year sentence. In this appeal, the petitioner claims that he received the ineffective assistance of counsel based on trial counsel's failure to (1) object to the prosecution's use of leading questions when examining the victim, and (2) impeach the testimony of the victim. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court in which ALAN E. GLENN, and ROBERT W. WEDEMEYER, JJ., joined.

J. Chase Gober, Nashville, Tennessee, for the Defendant-Appellant, Timmie Darrell Boston.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Amy Eisenbeck, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Background.** Boston was indicted for three counts of rape of a child, a Class A felony, and four counts of aggravated sexual battery, a Class B felony. After trial, a jury convicted him of one count of rape of a child and one count of assault by offensive or provocative contact, a lesser included offense of aggravated sexual battery. Boston's convictions stemmed from events between October 2000 and February 2002. This Court summarized the facts relevant to Boston's convictions in its opinion on direct appeal:

[T]he [seven- year-old] victim lived with her mother, grandmother and several siblings in a house on Stockell Street. [Boston], who had once worked with and dated the victim's mother, was considered a family friend and frequently visited their home. The victim and her siblings also spent time at [Boston]'s house, and he occasionally baby sat for the family at both locations. For several days during the month of February in 2002, [Boston] was ill and had been invited to stay with the victim's family at their Stockell Street residence.

. . . On the evening of February 14, 2002, the victim went to sleep with her grandmother about 10:30 p.m. Sometime after midnight, [Boston] entered the bedroom and penetrated the victim's genitals and anus with his finger. The victim immediately woke up, screamed, "fell on" her grandmother to wake her, and stated that [Boston] had "touched" her. The grandmother observed [Boston] standing in her bedroom and asked him to leave. [Boston] complied, and the victim and her grandmother went back to sleep.

Later that morning the victim got up and went to school. [Boston] remained at the house and assisted the victim's grandmother with household chores, all the while muttering audibly that he "messed up." When the victim returned home from school, she reported to her grandmother that she had difficulty urinating and it "burned" when she tried. Members of the victim's family accused [Boston] of rape, an altercation broke out, and the police were called. . . .

Further investigation revealed prior sexual contact between [Boston] and the victim . . . .

. . . .

The victim . . . testified that [Boston] touched her inappropriately on other occasions prior to the February 15, 2002, incident. . . . The victim . . . described an[] occasion at [Boston]'s house when he "hunched" her on the couch in the front room. The victim described "hunching" as when she laid on the couch, fully clothed, and [Boston], also fully clothed, laid on top of her in a manner in which their genitals were positioned over one another, and [Boston] moved backwards and forwards in that position. She further stated

-2-

that [Boston] had shown her "nasty" movies at his house which depicted naked men and women "hunching" . . . .

State v. Timmie Darrell Boston, No. M2003-03069-CCA-R3-CD, 2005 WL 225026, at *1-2 (Tenn. Crim. App., at Nashville, Jan. 28, 2005), perm. to appeal denied (Tenn. May 23, 2005).

Boston appealed his convictions and sentences, and this Court affirmed the trial court's judgments. Id. at *1. Boston filed a post-conviction petition, alleging that his trial counsel were ineffective based on a number of grounds, including a failure to object to the prosecution's leading questions during direct examination of the victim and a failure to impeach the victim's testimony.[1] The post-conviction court subsequently held an evidentiary hearing on the matter.

Co-counsel testified at the hearing that, at the time of Boston's trial, she worked for the Public Defender's Office. She became involved in the case around December of 2002, shortly before the date on which Boston's case was initially scheduled for trial. Co-counsel said that lead counsel, who had been handling Boston's case previously and was also an attorney with the Public Defender's Office, had some personal problems arise soon before trial. As a result, it was decided that another seasoned attorney should be available to assist during the trial if necessary. Around the same time that co-counsel first began working on the case, the State sought and obtained a superseding indictment, and the trial date was postponed a couple of months. During this delay, co-counsel became more involved in preparing for the trial. Nevertheless, co-counsel characterized her involvement as secondary to lead counsel's.

Co-counsel testified that lead counsel had already completed most of the pre-trial investigations and preparations before she became involved in the case. Co-counsel went with lead counsel and an investigator with the Public Defender's Office to interview the victim. Co-counsel described spending time with Boston preparing him to testify at trial. Leading up to the trial, the two attorneys discussed trial strategy regularly.

At trial, co-counsel said that she delivered the opening statement and performed the direct examination of Boston. She testified that lead counsel cross-examined the State's

---

[1] In his brief to this court, Boston limits his appeal to these two grounds of ineffective assistance of counsel. As a result, all the other claims he raised before the post-conviction court are waived.

witnesses, including the victim, and delivered the closing argument. Co-counsel could not remember suggesting particular objections at trial or disagreeing with lead counsel's decisions concerning objections. Rather, co-counsel remembered "that [she] thought it was going pretty well, that [lead counsel] was doing a pretty spectacular job."

Lead counsel testified that she worked for the Public Defender's Office when she was appointed to represent Boston in February 2002. She listed the numerous dates she met with Boston in the months before trial and described the topics of discussion for each of those meetings, including discovery, the applicable law, plea offers, possible witnesses, and Boston's testimony. Lead counsel and her office's investigator interviewed witnesses and potential witnesses, including the victim, the victim's grandmother, Boston's mother, and Boston's sister.

According to lead counsel, co-counsel became involved in the case around the time of the superseding indictment, "when it was clear that the case was going to be for trial." Lead counsel testified that she knew she would soon be leaving the Public Defender's Office at that time. She explained that co-counsel was assigned to assist in the trial as a matter of office policy, "so one [attorney] could be active listening while the other one is engaged in trial work." Lead counsel testified that she handled the majority of the trial, including the opening statement and the cross-examination of "the major witnesses." She described co-counsel's role as "baby-siting":

> She was the person who sat with Mr. Boston, explained to him what was going on so that if he had questions during the trial he could turn to her and she would be his primary contact person within the trial so that I could focus on my job. . . . [Before trial] [i]f there was a last minute question or something of that nature was going on, I would continue my work preparing for the trial and she would go to the jail to see him or answer his questions[.]

Lead counsel said that co-counsel also handled Boston's testimony at trial.

Lead counsel testified as to why she did not object to the prosecutor's leading questions during the direct examination of the victim. She explained that she had met the victim on prior occasions and had observed her demeanor. She said:

> When [the victim] came to court to testify, though, she was very closed. . . . And it became apparent to me that [the prosecutor], who I'm not sure actually

-4-

met her before the trial, was intimidating to her. And she was not very forthcoming with what she was – whatever statements she was going to make. And it was – he was actually – it was like pulling teeth for him to get her to say anything. And quite frankly it looked like – I'm not saying she was lying, but it looked like she was not forthcoming with any information. . . . So I listened very carefully, and I had a very good idea of what she was going to testify to. And it wasn't until she actually started to testify about issues that were damaging to [Boston's] case that I got up and objected.

Regarding Boston's allegation that counsel failed to impeach the victim, lead counsel explained her trial decisions:

I think, looking at my notes from the cross-examination that I had prepared for her, several of the areas had just been quite frankly completely X'd out because she never talked about them on direct. So certainly I wasn't going to impeach her and give the District Attorney another opportunity to go back and try to get her to clarify or explain what she hadn't talked about on direct. So there were several parts of my cross-examination that I X'd out because they were not covered on direct. And I believe when the State had to do its selection, several counts were taken away from the jury's consideration because the District Attorney's [O]ffice could – did not elicit any of those statements on direct. So as far as the points that were not listed on direct, of course, I didn't do a cross-examination of it because I didn't want to give the State another opportunity to come back and try to get more information out of her.

I did do a soft cross on her – again, she was a young lady – about some of the issues you might not say were very germane to the trial. But speaking with me, the fact she had met with me twice before, and I also think once she had met me with my daughter because I had a young child with me, when she was talking to me, she was very animated and open. And maybe we didn't talk about things that were specifically germane to [Boston's] case, but her attitude and demeanor had completely changed. So then when it got to where I did need to talk to her about a few issues that were specifically of the case, I believe . . . her answers were pretty forthcoming. And . . . that was my strategy for her cross-examination.

Lead counsel testified that she considered the final result in Boston's case to be "certainly" favorable, considering the number of indicted charges and his potential sentencing exposure.

Boston testified at the post-conviction hearing, primarily in regard to issues not currently before this Court. Of relevance to his appeal, he remembered meeting with lead counsel a few times before trial, but not all of the instances she testified to. He said that the defense at trial was for him to tell the truth:

> [A]ll I did was take the girl out. I befriended her because I was taking care of the other daughter . . . . Either way every time I tried to go to, you know, leave or whatnot she wanted to go. If it was my – if the one I was calling my daughter at the time was me or not, she just always wanted to be up under me. That's it. I befriended her. And I have been yelled at and cursed out because I done spoiled her. All I wanted to get at was the truth. That night I didn't do nothing but go to pick her up, and she jumped up in her sleep and she screamed.

Early in the process, he recalled discussing with counsel the likelihood he would need to testify at trial and beginning to prepare for his testimony.

Following the evidentiary hearing, the post-conviction court filed a twelve-page written order denying Boston's petition. Boston now appeals the court's denial of post-conviction relief.

## ANALYSIS

**Standard of Review.** Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a

legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S.

-7-

at 688, 104 S. Ct. at 2065; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 370. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689, 104 S. Ct. 2065). A court will defer to counsel's tactical or strategic choices as long as they are informed by adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89, 104 S. Ct. at 2065.

**Failure to Object.** Boston argues that trial counsel were ineffective for failing to object to the prosecutor's leading questions during the direct examination of the victim. He asserts that trial counsel allowed "the prosecutor to continually lead the witness regarding specific events and only objected after [the victim] had almost completed her testimony." The State responds that Boston has failed to produce clear and convincing evidence of his counsel's ineffective assistance. We agree with the State.

At the evidentiary hearing, lead counsel testified that she decided not to object to the prosecution's leading questions based on her assessment of the impression the questions gave the jury. She testified that the victim appeared to be intimidated by, and reserved toward, the prosecutor. Additionally, lead counsel suggested that it appeared as though the victim might be lying, or at least was not forthcoming with information. Lead counsel testified that as soon as the leading questions concerned information damaging to Boston's case, she objected.

Upon our review of the record, we find that Boston has not produced clear and convincing evidence that trial counsel were ineffective based on a failure to object. Rather, the evidence shows trial counsel's decision to be a strategic one informed by adequate preparation, and we decline to second-guess it. Furthermore, Boston has not produced evidence of any likelihood that the outcome of trial would have been different had counsel objected. Nor has he produced evidence that the decision not to object was deficient performance. Consequently, Boston is not entitled to relief on this issue.

**Failure to Impeach Victim.** Boston asserts that the post-conviction court erred in denying his claim for relief based on trial counsel's failure to impeach the victim. He argues that this "adversely affected Petitioner's defense and was not a trial strategy or tactic based on adequate preparation." The State again contends that Boston failed to produce sufficient evidence of his counsel's ineffective assistance in this regard. We agree with the State.

Lead counsel testified that she specifically avoided any of the possible grounds for impeachment that involved matters of which the prosecution had failed to elicit evidence. She explained that she did so to avoid allowing the State a second opportunity to prove those matters on redirect. Furthermore, lead counsel said that she strategically performed a "soft cross," eliciting more forthcoming responses than the State had received.

The post-conviction court found that Boston failed to prove that trial counsel's acts were deficient representation for the purposes of establishing the ineffective assistance of counsel. The court stated:

> This Court finds that both [trial counsel] met with the victim in a pretrial interview and therefore had an understanding of the victim's personality before hearing her testify during trial. The Court credits [lead counsel]'s testimony that she observed the victim become quiet during her direct examination by the State and felt that it made the victim appear to the jury to be hesitant to explain her story. The Court credits [lead counsel]'s opinion that limiting objections to harmful testimony and engaging in a "soft" cross-examination, designed to have the victim open up . . ., was a reasonable strategy to undermine the credibility of her story without eliciting sympathy for her by constantly objecting and aggressively cross-examining her. The Court therefore finds that the Petitioner has failed to prove that [lead counsel]'s efforts to impeach the victim were below the range of competence of an attorney in a criminal case.

This Court has previously held that "cross-examination is a strategic and tactical decision of trial counsel which is not to be measured by hindsight." State v. Kerley, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). "Allegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." Taylor v. State, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). Lead counsel avoided impeaching the victim on grounds that would have provided the State with another opportunity to elicit proof against Boston. Additionally, lead counsel did not impeach the victim in order to obtain "forthcoming" responses, contrary to those that the State received

on direct. The record reflects that trial counsel's strategic decisions regarding cross-examination were informed by adequate preparation and were well within the range of competent representation to which Boston was constitutionally entitled. Moreover, this tactical decision conceivably contributed to the prosecution's failure to elicit evidence on several of the charged offenses, leading to the dismissal of those charges. The post-conviction court's findings are supported by the record, and the petitioner has failed to demonstrate deficient performance or prejudice. As a result, his claim merits no relief.

## CONCLUSION

Upon review, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE